IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JOHN SNETSELAAR,           )
                           )
            Plaintiff,     )
                           )
      v.                   )  Case No.
                           )  07-3449-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,        )
                           )
            Defendant.     )

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff John Snetselaar seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act").  Plaintiff argues that (1) the ALJ erred in failing to adopt the opinions of Dr. Donald McGehee and Dr. Barbara Houk, and (2) the ALJ erred in failing to properly evaluate plaintiff's credibility especially with regard to medication effectiveness and side effects, work history, and disability determinations by other agencies.  I find that the ALJ erred in finding plaintiff not credible, and that the substantial evidence in the record as a whole supports a finding that plaintiff is disabled.  Therefore, plaintiff's motion for summary judgment will be granted and the decision of the Commissioner will be reversed.

## I. BACKGROUND

On January 7, 2005, plaintiff applied for disability benefits alleging that he had been disabled since December 31, 2003. Plaintiff's disability stems from bipolar I disorder[1], schizoid personality disorder, anxiety disorder, and depression. Plaintiff's application was denied on April 12, 2005. On November 16, 2006, a hearing was held before Administrative Law Judge David Fromme. On February 23, 2007, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On November 23, 2007, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.

---

[1] Bipolar disorder, also known as manic-depressive psychosis, is an affective disorder characterized by the occurrence of alternating periods of euphoria (mania) and depression.

1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory."  Wilcutts
v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v.
Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  Richardson v. Perales, 402
U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991).  However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts.  "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

**III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS**

An individual claiming disability benefits has the burden of
proving he is unable to return to past relevant work by reason of

3

a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

4

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

          Yes = disabled.
          No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

          No = not disabled.
          Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

          Yes = disabled.
          No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

### A.    SUMMARY OF TESTIMONY

During the November 16, 2006, hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified at the request of the ALJ.  Plaintiff was not represented by an attorney at the hearing.

### 1.    Plaintiff's testimony.

Plaintiff testified that he wanted the medical records from a hospital in Cincinnati included, but he did not see them in the record during the administrative hearing (Tr. at 287).  He tried to get the documents, but he does not know why they were not sent

5

(Tr. at 287-288).

Plaintiff went to school through the 11th grade and then got a GED so he could go into the Air Force (Tr. at 291). He was discharged honorably after less than three years due to "unadaptability to military life", even though he wanted to stay in the military (Tr. at 291).

At the time of the hearing, plaintiff was staying with a friend off and on and with his mother off and on (Tr. at 288-289). Plaintiff does not have medical insurance (Tr. at 289-290). He had Medicaid for a while and he saw a doctor who put him on medication (Tr. at 290). He had been on Zoloft but he had an allergic reaction and he was switched to Prozac (Tr. at 290). Plaintiff let his Medicaid run out (Tr. at 290). "I let it run out until I could get this settled up. I didn't feel right, you know, just -- this isn't about the money here. It's about need, and I just didn't want to keep the Medicaid going, until I knew what I could get going on." (Tr. at 290). Plaintiff testified that he has no way of paying for medical or mental health treatment (Tr. at 290). When asked if he has any source of income, plaintiff said, "When I help this guy, it pretty much pays enough that I can get my electric and stuff. I have to survive so I do everything I can, and it pays my electric and stuff, a little bit of rent, but that's about it. I feed myself.

6

I do have a responsibility." (Tr. at 290). Plaintiff does not receive food stamps (Tr. at 290). He said he was eligible for them and got them for a bit, but he gained 40 pounds and that "freaked him out" (Tr. at 290). "I eat a little bit every day. I can do that myself, you know. I'm surviving is what I'm doing, and I feel it's my responsibility. I don't want nothing from anybody, really." (Tr. at 290).

Plaintiff worked for a couple months at a place in West Palm Beach making aluminum products (Tr. at 292). "I remember being there, and I actually think I worked there and then I went through one of my things. And then I -- the guy -- I remember my boss -- he was a really cool guy -- he hired me back." (Tr. at 292). Plaintiff does not remember why he left that job (Tr. at 292). Plaintiff worked in maintenance at a job he said he loved (Tr. at 292-293). When asked why he left that job, he said, "I loved that job and I liked Steve Groves. It actually just started getting bigger and bigger, and I got into a depression. I bought this Jeep. It was an old Kaiser Jeep. And I just -- I couldn't stay. I couldn't -- it was just -- I don't know. This is what I'm trying to understand. It was just too much. And I got in it and left." (Tr. at 293).

Plaintiff also worked for Pride Cast Metals (Tr. at 293). "That was my favorite job I ever had, ever. Not because it was

7

easy or anything.  It's just -- I tested gas nozzles for OPW. . .
.  I remember that job explicitly.  He put me on second shift
because I would break down.  It sounds odd and stuff, but I just,
sometimes I just break down.  I can't -- he even made me foreman,
and I couldn't do it." (Tr. at 293-294).  When asked why he left
that job, he said, "I went through -- I had been in a
relationship, and me and my girlfriend had broken up.  And I just
couldn't take it.  I was just going through massive depression.
She left the house and I couldn't -- I was renting from my boss.
I mean, he put me on second shift because people were freaked out
on me, you know. . . .  My boss . . . would give me -- this is
where I feel this is odd, and I have to go back and think about
this because all I can do is be straight up.  It's very
important.  He would give me Darvocets [narcotic] to chill me
out, to keep me from crying and breaking -- you know, he needed
his work done, plain and simple." (Tr. at 294).

     Plaintiff was asked about the temporary agency he worked for
during 2003 (Tr. at 295).  "I did every kind of -- anything.
From sweeping up construction sites to packing.  You know, I love
working.  I love doing stuff.  And actually, the Labor Ready, I
had more luck there than anywhere because I could work.  And
these things would come on, the -- you know, the stuff would come
on, and I could take a day off and they wouldn't fire me.  They

8

wouldn't run me off, they wouldn't get angry. You know, well --
but see, what happened there with Labor Ready is I would go into
work with three or four other people.  They wouldn't want them to
come back, and they would want me to come back.  And sign my--
and want me to come back.  And it got to -- you know, if I as in
my depression or -- and then I have some physical things going
on.  Those things come up, I couldn't go in.  Well, they would --
that's when they would get mad.  And then they'd give me the
worst job in the world, and I'd go do it.  I've always had to
start over." (Tr. at 295).

Plaintiff was asked why he believes he cannot hold a full-
time job (Tr. at 296).  He said, "Well, I mean, I've thought
about this a lot. I could get any job.  I'm determined. These
things that happen are emotional.  It's like right now I'm so
determined to be a positive -- it works on me in time.  Sometimes
it's quick, sometimes it's long.  I'm around a guy now that's the
most optimum positive Christian guy that I've ever known, and I
try to help him.  And the weight of everything, and I don't know
where it comes from.  I don't -- I tried.  I've tried figuring it
out, and that's why I'm here because I can't figure it out.
Years and years I've tried to figure it out.  Just blocking it
out, still works on me.  I don't know what it is.  But I will --
I'll get down and nobody wants to be around me.  It'll get --

I'll get -- it'll make me ill and nobody wants to be around that.
So one of two things happens.  I get fired, which I've gotten
fired very rarely.  Or I get run off, I get the hardest jobs.
Well, we'll give him the hardest jobs.  He won't take it.  Well,
eventually, I can't.  Or I just get to the point where I just
can't -- and I leave to hold my -- some kind of like head up.  To
just, you know --" (Tr. at 296-297).

Plaintiff said that he has physical problems from getting
the hardest jobs, including wrist problems from a fracture, knee
problems from falling off a ladder, right shoulder problems from
getting beat up by a man who was jealous that the boss liked
plaintiff better (Tr. at 297-298).

When asked what he does for relief of pain, plaintiff said
he has an old waterbed and he turns the heat up as high as it
will go and he lies on it (Tr. at 302).  When plaintiff is having
his "depression thing," he will stay in bed all day (Tr. at 303).
When asked if he takes any medicine, plaintiff said, "No.  The
only medication -- or the only thing that I do for medicine in
myself is when I get a migraine.  I go get a Slushy.  The cold
Slushy drink gets rid of my migraine headaches.  That's the only
thing I found to get rid of it, so that's really the only
medication I do." (Tr. at 303).  Plaintiff gets migraines from
one to four times per month (Tr. at 303).  After he gets a

Slushy, he lies down in a dark room with no light (Tr. at 303).
It takes about four hours for the migraine to go away (Tr. at
303).

Plaintiff was asked whether he had seen a doctor for
anything since 2003 (Tr. at 305). He said he saw a doctor at
Springfield Family Health Clinic who gave him Zoloft and Prozac
for insomnia (Tr. at 305). According to the ALJ, those records
are not in the administrative file (Tr. at 305). When asked if
there was anything he wanted to add, plaintiff said, "Well, the
doctor that I seen at Springfield Family Health Clinic, he tried
Prozac which I've tried Prozac before. It just puts me in more
of an isolation thing. I don't want to be around anybody.
Zoloft -- I had an allergic reaction to it, so I told him that.
He didn't want to try that. He wanted to give me some kind of
sleeping pill or something like that. I'm not really -- I've
tried over-the-counter stuff. But actually, I'm starting to sleep
now, and it's been awhile that I've been had any insomnia thing.
So you know, these things -- it's been all my life. I've learned
to deal with it. That doesn't make it right. I don't want
money. I don't want any -- I just -- I want -- I've given upon
being okay." (Tr. at 306).

Plaintiff was asked if he has a driver's license, and he
said, "Yes. I let it run out from Ohio. I had a DWI from 1993

11

here, and it just kept bothering me and bothering me, and I dealt
with it.  I went to court, I paid the thing, I did the
[inaudible].  I'm free now to reinstate my Missouri license and
get insurance.  I had an Ohio license and they -- because I
wasn't a resident of Missouri at that time, they let me have a
[inaudible] license.  I let it run out because I don't drive
much.  I would like to change that, but the state that things are
in, I don't feel comfortable with doing it." (Tr. at 306).
Plaintiff's boss gave him $30 to take a cab to the hearing (Tr.
at 306).

**2.  Vocational expert testimony.**

Vocational expert Cathy Hodgson testified at the request of
the Administrative Law Judge.  The ALJ asked the vocational
expert if a person could work if the person were limited in the
manner testified to by plaintiff (Tr. at 308).  The vocational
expert testified that such a person could not sustain work (Tr.
at 308).  Plaintiff interrupted at this point and said, "See,
that's the problem.  I want to work.  I want to do stuff." (Tr.
at 308).

The second hypothetical adopted the findings of Dr. Lutz
(Tr. at 308).  The vocational expert testified that the person
could perform all of plaintiff's past relevant work (Tr. at 308).

12

The third hypothetical adopted the findings of Dr. Lutz but also limited the person to lifting 50 pounds occasionally and 25 pounds frequently and should avoid frequent or repetitive gripping and handling with the dominant hand (Tr. at 308). The vocational expert testified that such a person could not return to any of plaintiff's past relevant work due to the limitation on gripping and handling (Tr. at 308-309). The person could, however, be a counter clerk with 100,000 in the nation and 2,500 in Missouri, or a furniture rental consultant, with 35,000 in the nation and 700 in the region (Tr. at 309).

**B.   *ADMINISTRATIVE REPORTS***

The record contains the following administrative reports:

**Earnings Records**

The record establishes that plaintiff earned the following income from 1976 through 2006:

| Year | Earnings | Employers |
|------|----------|-----------|
| 1976 | $   779.96 | Unknown |
| 1977 | 1,108.95 | Unknown |
| 1978 | 5,162.26 | Unknown |
| 1979 | 2,341.64 | Unknown |
| 1980 | 3,097.36 | Unknown |
| 1981 | 3,201.85 | Unknown |
| 1982 | 3,967.86 | Unknown |
| 1983 | 3,592.99 | Unknown |

13

| 1984 | 6,109.87 | Unknown |
|------|----------|---------|
| 1985 | 8,982.98 | Unknown |
| 1986 | 1,240.00 | Unknown |
| 1987 | 6,676.56 | Unknown |
| 1988 | 2,587.55 | Unknown |
| 1989 | 4,478.44 | Unknown |
| 1990 | 6,744.44 | Manpower of the Palm Beaches $30.00<br>Spectrum Tile & Marble $2,141.50<br>Labor World USA $52.00<br>Don Carters All Star Lanes $4,520.94 |
| 1991 | 5,372.76 | ARC Enterprises $1,335.50<br>Poma Corporation $3,031.00<br>Auto Search of the Palm Beaches $1,006.26 |
| 1992 | 4,734.13 | Morris Oil & Gas $4,734.13 |
| 1993 | 422.63 | D&D Desserts $180.63<br>Express Services, Inc. $242.00 |
| 1994 | 3,855.52 | Little Rock Construction $82.50<br>Noble Romans Pizza $93.93<br>Labor Power, Inc. $3,133.03<br>Marathon Fuels $463.25<br>Rallys Restaurant $82.81 |
| 1995 | 297.95 | Labor Power, Inc. $297.95 |
| 1996 | 2,200.08 | Quality Insulation & Building $1,113.75<br>Westminsters Billiard Club $1,086.33 |
| 1997 | 1,132.00 | Micar Unlimited $1,132.00 |
| 1998 | 626.33 | Labor Ready, Inc. $626.33 |
| 1999 | 5,509.60 | Pride Cast Metals, Inc. $5,509.60 |
| 2000 | 15,501.86 | Pride Cast Metals, Inc. $15,501.86 |
| 2001 | 17,145.19 | Pride Cast Metals, Inc. $17,145.19 |
| 2002 | 16,514.89 | Pride Cast Metals, Inc. $16,319.89<br>Lee's Home Improvement $195.00 |
| 2003 | 4,906.15 | Labor Ready Mid-Atlantic $2,655.27<br>Moellering Industries $2,250.88 |

14

| 2004 | 2,847.16 | Moellering Industries<br>Sun Flower Coffee Shop | $398.75<br>$2,448.41 |
|------|----------|--------------------------------------------------|-----------------------|
| 2005 | 0.00 | None | |
| 2006 | 0.00 | None | |

(Tr. at 63-71).

**Function Report**

In a Function Report dated January 17, 2005, plaintiff was asked how his impairments affect his ability to do certain things (Tr. at 86-93). These are his responses[2]:

Dress:  I don't really care how I look.  If I'm dirty people leave me alone, avoid me.

Bathe:  My mom lets me take a shower sometimes, if I have propane for hot water

Care for Hair:  I don't care

Shave:  sometimes

Feed self:  When I'm hungry I'll eat if I have some food

Use the toilet:  No problem.  I was impacted once and very scared and sick, then I became regular again.

Other:  I live in a small trailer and I have to keep it clean.  Cleaning keeps me from being depressed sometimes.

Plaintiff was asked whether he takes care of pets or other animals.  His response: "I had a cat for 7 years.  I fed it by hand from a small kitten.  I loved it with all my heart.  When I came here I couldn't take care of it any more (I didn't have

---

[2]I have corrected plaintiff's spelling mistakes for ease of reading.

15

anywhere to live) so I had to give her away.  My brother has her."

Plaintiff was asked how often he prepares meals, and he wrote, "I try to eat a good meal every day or so".  When asked if his impairments have caused any changes in his cooking habits, plaintiff wrote that sometimes he has to "dumpster dive".

When asked about his hobbies, plaintiff wrote that he enjoyed reading but he lost all of his books.  He does not watch television because it gives him headaches.  He cannot listen to music because it makes him cry.

Plaintiff reported that he lives in a trailer out in the country in exchange for cleaning up the property for the owner.  He has to go out to chop wood for heat and to collect water.  He rarely sees any people.

When asked how well he gets along with authority figures, plaintiff wrote, "I had a great boss (he was younger than me, typical) he really helped me.  He didn't give me a raise after being there for 3 years and I got beat up there so I eventually quit.  I ended up not respecting him.  I don't get in trouble because of jail and police.  It's always bad and I try to stay out of trouble.  But it happens even when I don't do anything.  I'm scared of police.  It's hard to go into courtrooms, food stamp office, hospital, etc.  I can get along.  I have respect."

16

When asked if he has noticed any unusual behavior or fears, plaintiff wrote, "My sleep has changed.  I have been in trouble and it's been something that I got more and more obsessed about not getting in trouble and since I've come home I have had to deal with some old trouble I got into 13 years ago.  Very scared and nerved out.  My head thinks more than I used to.  The voice (my thinking) is way more than usual."

**Disability Report Appeal**

In an undated Disability Report Appeal, plaintiff was asked how his impairments affect his ability to care for his personal needs (Tr. at 119).  He wrote, "Nobody can help me.  Nobody will give me a job.  I try and I'm going to family services for help. I have no real friends that will help me. I have no place to park my trailer.  I don't know what to do."

**Disability Report Adult**

In a Disability Report dated February 8, 2006, plaintiff reported that he is 6'3" tall and weighs 165 pounds (Tr. at 136). He was asked if he has a medical assistance card, and his answer was "no" (Tr. at 136).

***C.    SUMMARY OF MEDICAL RECORDS***

On August 9, 2003, plaintiff underwent an aspiration of the right knee joint (Tr. at 159-179).  He went to the emergency room four days after he fell off a ladder, hurting his eye, wrist, and

knee. He reported that he fell onto some branches. He tried to walk the pain off and did OK with that until he started noticing swelling and redness. He described his pain as a 10/10. He was admitted due to right knee pain, swelling and redness and a low-grade fever. He had a high white blood cell count. Plaintiff's range of motion of his knee was limited to 15 degrees. He was discharged with a brace and a cane along with prescriptions for Cipro, Dicloxacillin, and Percocet. He was told to limit himself to light duty.

On January 28, 2005, plaintiff saw Donald McGehee, a licensed psychologist, at the request of Greene County Division of Family Services (Tr. at 180-182). The records read in part as follows:

> He is 6'3" tall and weighs 165 pounds. He was unkempt and dirty. He was unshaven and had long unkempt hair. He was wearing unclean clothing and generally exhibited poor personal hygiene. Facial expressions were dull, and eye contact was poor. There were some bizarre mannerisms. He was a cooperative individual who related well with the examiner. He appeared to be experiencing a severely anxious and depressed mood and was fairly suspicious. Affective responses were flat, although he was tearful at one point. . . . He exhibited some symptoms of a thought disorder. He described paranoid delusions, and flight of ideas and obsessions were noted. . . .
>
> **Background Information:**
> John is one of three sons born to his parents who have maintained an intact relationship. He has been married and divorced twice. He has a twenty year old son who he has not seen since he was three. . . .

18

**Problem and Pertinent History:**
The claimant complains of depressive symptoms, insomnia, and
constant pain in his left knee and right hip and wrist.  He
has no physician and is taking no medications because he has
no money.  He admitted himself to the University of
Cincinnati Medical Center in 1998 where he spent three
months.  He was diagnosed with bipolar disorder and
antisocial personality disorder at that time.  He has made
three suicide attempts on his life.  He currently has a
camper trailer, and he lives on various properties as a
caretaker or watchman.  He generally lives in the woods and
is very alone and withdrawn.

**Tests Administered:**
Clinical Interview and Mental Status Exam
Personality Assessment Screener (PAS)
Michigan Alcohol Screening Test (MAST)
Mood Disorder Questionnaire

**Test Results**:
The MAST reveals no alcoholism. The Mood Disorder
Questionnaire is consistent with bipolar disorder.  The PAS
reveals a markedly disturbed person who is seriously
paranoid.  He is extremely withdrawn and alienated from
other people.  He is a high risk for suicidal ideation and
gesturing.  He has a number of physical complaints that are
probably also an expression of the depressive symptoms.  He
is fairly angry and tends to act out that anger, but he also
seems to have some ability to modulate himself.

**Summary:**
. . . .  He is very withdrawn and alienated from other
people.  He seems to have little support system.  He
complains of physical pain in his neck, knee, right hip and
wrist.  He also complains of major depression. . . .  There
is no evidence of significant substance abuse.  He remains a
high risk for suicidal ideation and gesturing.  Based on
this evaluation, he meets the criteria for medical
assistance.

**Diagnosis:**
Axis I      Bipolar I Disorder, most recent episode depressed,
            severe without psychotic features, by history
Axis II     Schizoid Personality Disorder
Axis III    Chronic pain in knee, right hip and wrist

Case 6:07-cv-03449-REL   Document 21   Filed 11/07/08   Page 19 of 47

```
Axis IV   Problems with primary support system - has not
          seen son for 17 years
          Housing problems - homelessness
          Occupational problems - unemployed
          Economic problems - no income
          Problems with access to healthcare - lack of funds
          to provide needed healthcare
Axis V    Current GAF:  31[3]
```

On March 2, 2005, plaintiff saw David Paff, M.D., an

occupational physician, for a disability evaluation at the

request of the Division of Family Services (Tr. at 185-186).  Dr.

Paff found that plaintiff walks normally, was able to walk on

heels and toes and to squat fully.  He had full range of motion

in his lumber spine, cervical spine, and shoulders.  He had

decreased flexion in his right wrist which had been previously

fractured.  Plaintiff's chest x-rays were normal.  X-rays of his

right wrist showed degenerative changes of a moderate degree.

Pulmonary function testing was normal.  Dr. Paff concluded that

plaintiff is not disabled.

On April 5, 2005, plaintiff saw David Lutz, Ph.D., a

clinical psychologist, after having been referred by Disability

Determinations (Tr. at 194-198).  Dr. Lutz's report reads in part

─────────────

[3]A global assessment of functioning (GAF) of 31 to 40 means
some impairment in reality testing or communication (e.g., speech
is at times illogical, obscure, or irrelevant) or major
impairment in several areas, such as work or school, family
relations, judgment, thinking, or mood (e.g., depressed man
avoids friends, neglects family, and is unable to work; child
frequently beats up younger children, is defiant at home, and is
failing at school).

20

as follows:

Mr. Snetselaar, whose stated age was 45, reported that he
has many concerns about his life. He began to cry as he
stated, "It seems like everything I've tried has failed.
I've prided myself on being an optimist." He said that he
sometimes has overwhelming feelings of dread, and feels sad.
He stated that he has had some feelings for many years. He
suggested that he has often felt that others might take
advantage of him and try to hurt him. He felt that he has
had such symptoms for many years, but felt that his symptoms
have intensified and become more frequent in the past five
years. He felt that he has lost interest in some previously
enjoyable activities, such as relationships and music. He
has found it difficult to listen to the radio. . . . He
said that he has some times during which he feels good,
which might last for a short period. . . . Mr. Snetselaar
reported that when he was in school, he had difficulty
staying in his seat and talked too much. . . .

HISTORY:
Mr. Snetselaar reported that he attended school through part
of the twelfth grade, stating that he quit school because he
did not fit in well. He described himself as a poor grade,
receiving primarily Cs, Ds, and Fs, stating that he was
retained in the fourth grade. He suggested the possibility
of hyperactive behavior as a child, but attended regular
classes. . . . Mr. Snetselaar denied any current alcohol
usage. He indicated that he has used alcohol two or three
times in the past five years. . .. Mr. Snetselaar reported
that he has used many illicit drugs, including marijuana,
cocaine, and LSD, but suggested that his last usage of
everything except marijuana was about 10 to 15 years ago.
He reported that he last used marijuana about five years
ago. He indicated that his only regular usage was
marijuana, which he used to slow things down. . . . Mr.
Snetselaar denied having been hospitalized in a psychiatric
hospital. When asked about having received psychological
counseling, he reported that he sought counseling about 15
years ago. He explained that he was living in an abandoned
house, and having difficulty getting by. He reported that
about seven to eight years ago, he sought further counseling
after having had problems with his girlfriend. He had
thoughts, feelings as if he was crazy. . . . Mr. Snetselaar
reported that he has attempted suicide three times. He said
that about 20 years ago, he cut on his wrists during

21

problems with his first marriage.  He described this as a
cry for help.  He said that another time he sat on a bridge
waiting for a vehicle to run over him.  He indicated that
about three years ago, he put himself into a pond of water,
but could not complete this act.  "Sometimes the pain got
too much."

FAMILY HISTORY:
Mr. Snetselaar reported that he has stayed with a friend
sporadically, and at other times stays with his mother or
brother.  He generally lives in a trailer alone. . . .  Mr.
Snetselaar reported that he has contact with a few
relatives, such as his mother.  He reported that his mother
has symptoms similar to his own, for which she apparently
has received some treatment.  He indicated that his maternal
grandfather may have been isolate and reclusive.

SOCIAL HISTORY:
Mr. Snetselaar reported that he has one good friend whom he
sees occasionally.  He stated that [he] goes through waves
of involvement with others, stating that he wants to fit in
with others.  He felt that he has difficulty relating to
others because he feels like a failure.  He explained that
he does not like others looking at him, stating that he does
not like having others who are bad look at him and seeing
that he is good.  He said that one of his psychological
evaluations said that he does not like people, a conclusion
with which he disagreed.

PHYSICAL COMPLAINTS:
Mr. Snetselaar reported that he is not currently taking
medications.  He indicated that he previously took Zoloft,
but had an allergic reaction, and was placed on Risperidone
[anti-psychotic], but discontinued this medication because
he found it too sedating and he lost his motivation. . . .

EMPLOYMENT HISTORY:
Mr. Snetselaar reported that he was discharged early from
the military for unadaptability.  He stated that he has had
"hundreds of jobs" . . ..  He indicated that special
accommodations have sometimes been made to keep him working.
. . .

DAILY ACTIVITIES:
Mr. Snetselaar reported that he gets up about 6:00 a.m. and
drinks coffee.  He indicated that he drinks less than one

liter of caffeinated beverages daily.  He may watch
television, and tries to find some tasks to do around his
house.  He stated that he frequently sits and thinks about
the many problems in his life.  He tries to give himself
projects, but does not get as much done as he would like.
"It's almost like I want to do more than I can."  He said
that he prepares his meals, as he cooks for himself.  He
indicated that he has a fair appetite, which has been
typical for him.  He suggested that he eats more when he is
happy.  He stated that in the afternoon and evening, he
sometimes reads, including existential novels.  He often
takes a short nap during the day.  He also works on the
computer, stating that he tries to make music, and also has
tried art.  He said that he does some household chores as he
tries to keep his trailer clean.  He stated that he lets
things pile up, and then engages in thorough cleaning.  He
said that he takes care of his shopping.  He reported that
he goes to bed about 1:00 a.m., but has considerable
difficulty getting to sleep.  He believed that his sleep has
deteriorated over the past two years which he attributed to
difficulties in his relationship.

MENTAL STATUS:
. . .  His hygiene was somewhat less than adequate, his
clothes tattered, and his look generally disheveled. . . .
Mr. Snetselaar arrived about 15 minutes early for the
interview, stating that a friend brought him. . . .  He
exhibited dysphoria at various times throughout the
interview, and seemed to have little sense of what he could
do to change his situation.  He seemed greatly discouraged
by his situation.  It was difficult to reconcile his
statements concerning the depth of his depression with the
fact that he has received only limited treatment. . . .  He
did not evidence any unusual or bizarre behavior. . . .  Mr.
Snetselaar was oriented to time, person, and place.  He
remembered correctly four digits forward and three digits
backward.  He counted backward from 20 to 1 in 24 seconds
with no errors.  He said the alphabet in 11 seconds with no
errors.  He did serial threes from 1 to 40 in 41 seconds
with no errors.  He did serial sevens backward from 100 to
72 in 45 seconds with three errors.  On proverbs, to
chickens, he responded, "Don't count on nothin'."  To
spilled milk, he stated, "Things happen.  There's no sense
in being too sad about it."  To glass houses, he stated,
"Don't go around being mean."  He remembered correctly three
of three things immediately, and two of three things after

Case 6:07-cv-03449-REL   Document 21   Filed 11/07/08   Page 23 of 47

five minutes.  He remembered correctly the other item with
semantic prompting.  He remembered correctly 15 of 15 items
on the Rey test although he transposed two figures.  His
short term memory and long term memory were consistent with
his general intellectual functioning, which I would estimate
to be in the low average to possibly average range.

* * * * *

DIAGNOSIS:
Based on the client's subjective report of difficulties in
relationships and observations of dysphoria during this
examination, the most appropriate diagnoses are likely to
be:
Axis I      Dysthymic disorder[4], moderate, late onset . . .
Axis II     Borderline characteristics
            Difficulties in relationships, feelings of
            emptiness
Axis III    Neck problems, headaches
Axis IV     Unemployment, limited interpersonal contact,
            housing, legal problems
Axis V      GAF = 55[5] (current)
            Moderate symptoms

MEDICAL SOURCE STATEMENT:
Mr. Snetselaar seemed able to understand and remember simple
and moderately complex instructions and probably complex
instructions.  He seemed able to sustain concentration and
persistence on simple and moderately complex tasks and
possibly complex tasks.  He seemed able to interact in
moderately demanding social situations.  He seemed able to
adapt to his environment.

---

[4]Dysthymia is a chronic mood disorder manifested as
depression for most of the day, more days than not, accompanied
by some of the following symptoms:  poor appetite or overeating,
insomnia or hypersomnia, low energy or fatigue, low self-esteem,
poor concentration, difficulty making decisions, and feelings of
hopelessness.

[5]A global assessment of functioning of 51 to 60 means
moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts
with peers or co-workers).

Case 6:07-cv-03449-REL   Document 21   Filed 11/07/08   Page 24 of 47

On April 8, 2005, Alan Aram, Psy.D., completed a Psychiatric Review Technique without having met or examined plaintiff (Tr. at 201-214). He found plaintiff's mental impairment not severe. In support of his findings, he noted an "adequate work history" and plaintiff's lack of treatment. "Cl[aimant's] allegations are only partially credible in that he is not seeking any Tx [treatment]."

On May 9, 2005, plaintiff was seen at Medical Walk in Clinics in Springfield (Tr. at 243-245). He complained of frequent chest pains, numbness in his right arm, chronic neck pain, depression, and insomnia. "Patient wants help/referral in dealing with depression. Trying to get into Burrell [Behavioral Health] but they have told him it will be 4-6 weeks, doesn't feel like he can wait that long." His symptoms had been present off and on for 25 years but had worsened in the last three years. Plaintiff was observed as being sad, crying, isolated, anxious, depressed, disheveled, tearful. Most of the notes of the exam are illegible. The doctor wrote, "meets DSM IV criteria for Bipolar Disorder". The doctor prescribed Zyprexa (anti-psychotic) and Celexa[6].

---

[6]Celexa is a selective serotonin reuptake inhibitor (SSRI) which affects chemicals in the brain that may become unbalanced and cause depression, panic, anxiety, or obsessive-compulsive symptoms.

On May 17, 2005, plaintiff was seen at Medical Walk in Clinics in Springfield (Tr. at 240-242). He complained of frequent chest pains, numbness in his right arm, chronic neck pain, and depression, all of which had been going on for seven years. Most of the doctor's notes are illegible. The doctor assessed chronic neck pain, bipolar disorder, and insomnia, but the remainder of the assessment is illegible. The prescription medication is illegible.

On May 31, 2005, plaintiff was seen at Medical Walk in Clinics in Springfield (Tr. at 237-239). He complained of frequent chest pains, numbness in his right arm, depression, and increased worry. He said that he ran out of his Zyprexa because he could not afford the $3 co-pay. The doctor diagnosed bipolar disorder with panic attacks and insomnia. He told plaintiff to resume taking Zyprexa and continue taking Celexa.

On July 7, 2005, plaintiff was seen at Medical Walk in Clinics in Springfield (Tr. at 234-236). Plaintiff had not been sleeping and he complained of neck pain. The doctor diagnosed bipolar disorder and depression and prescribed Zyprexa (anti-psychotic), Prozac[7], and Xanax (treats anxiety). "Bipolar disorder. Depressed most of the time. Patient is passive,

_____

[7]Prozac is an SSRI which affects chemicals in the brain that may become unbalanced and cause depression, panic, anxiety, or obsessive-compulsive symptoms.

emotional, unable to find work.  Has become a recluse.  Lost interest in things, feels guilty, feels worthless."

On August 4, 2005, plaintiff was seen at Medical Walk in Clinics in Springfield (Tr. at 231-233).  Plaintiff was taking Zyprexa[8], Naproxen (a non-steroidal anti-inflammatory), Prozac and Xanax (treats anxiety).  Plaintiff said he felt tired but could not sleep.  "He thinks about things all day, feeling hopeless, dreadful, dreaming a lot."  These symptoms had been present for the past three years.  Plaintiff was diagnosed with bipolar disorder, obsessive compulsive disorder, and insomnia, "cannot rule out schizophrenia"[9].  The doctor adjusted plaintiff's doses of Prozac and Xanax.  The doctor noted that Zyprexa caused irritability and bad dreams.  "Consider Trileptal [anti-seizure medication] and/or Cymbalta [anti-depressant] if present therapy fails."

On September 19, 2005, plaintiff was seen at Medical Walk in Clinics in Springfield (Tr. at 228-230).  He complained of anxiety.  Plaintiff had been on Prozac, but his mood swings had

---

[8]The writing is somewhat illegible, but it appears that this is the medication listed, and the doctor refers to Zyprexa later in this record at p. 232.  Zyprexa is an anti-psychotic medication.

[9]Schizophrenia is a psychosis characterized by abnormalities in perception, content of thought, and thought processes and by extensive withdrawal of interest from other people and the outside world.

Case 6:07-cv-03449-REL   Document 21   Filed 11/07/08   Page 27 of 47

increased and he had not slept in four days. He was feeling scared and frustrated. During his exam, plaintiff was crying. He was assessed with depression/anxiety and bipolar disorder. The doctor prescribed Seroquel (anti-psychotic) and referred plaintiff for a psychiatric evaluation. "Patient is emotional, unable to sleep. Bipolar disorder not controlled. Presently on Xanax and Prozac. Patient referred to Cox North for more extensive psychiatric evaluation."

The following medical evidence was presented to the Appeals Council after the ALJ denied plaintiff's application for disability benefits:

On June 6, 2007, plaintiff saw Barbara Houk, M.D., a psychiatrist (Tr. at 278). Dr. Houk's records consist mainly of abbreviations and initialisms which are very difficult to decipher. Most of her records are illegible. Dr. Houk observed that plaintiff had a sad and depressed affect. His insight was poor, his judgment was fair. She assessed generalized anxiety disorder and some other unidentifiable condition. Plaintiff's GAF was 25.[10] Plaintiff was told to stop taking an illegible medication and to start on Zonagran (an anti-seizure medication).

_____

[10]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

Case 6:07-cv-03449-REL   Document 21   Filed 11/07/08   Page 28 of 47

On June 14, 2007, plaintiff saw Dr. Houk (Tr. at 277).  Most
of this record is illegible.  Dr. Houk assessed generalized
anxiety disorder, personality disorder, and some other
unidentifiable condition.  She prescribed Trileptal (anti-seizure
medication).  There are notations of four other depression/anti-
psychotic medications on the record, but I cannot tell whether
these medications were prescribed on this date.  On June 18,
2007, plaintiff called Dr. Houk's office and said he had not
slept for four days since going on the Trileptal and his physical
problems had also worsened (Tr. at 277).  Dr. Houk told plaintiff
to reduce his dose by one tablet for an illegible number of days,
then wait another number of days with taking none, then to begin
by taking 1/2 pill in the morning and 1/2 pill in the evening.
On June 21, 2007, plaintiff called to say "just can't handle it
anymore."  Someone recommended he be evaluated at the emergency
room.  The rest of the record appears to be observations by a
third party, but I cannot tell for sure and part of it has been
cut off in copying.

On July 5, 2007, plaintiff saw Dr. Houk (Tr. at 276).  She
assessed generalized anxiety disorder, personality disorder,
headaches, and another unidentifiable condition.  She prescribed
Depakote ER.

29

On July 10, 2007, plaintiff saw Dr. Houk (Tr. at 275). She assessed generalized anxiety disorder, personality disorder, and some other unidentifiable condition. She wrote, "has problem with trust of others". She prescribed Depakote ER.

On July 23, 2007, Dr. Houk completed a Medical Source Statement - Mental (Tr. at 268-271). Dr. Houk noted that she had not seen plaintiff for "one full year." This is curious since there are records from Dr. Houk dated June 6, 2007; June 14, 2007; June 18, 2007; June 21, 2007; July 5, 2007; and July 10, 2007. Dr. Houk found that plaintiff was not significantly limited in the following:

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to be aware of normal hazards and take appropriate precautions

She found that plaintiff is mildly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to carry out very short and simple instructions

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

She found that plaintiff is moderately limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

She found that plaintiff was markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

Dr. Houk made notations on several of the above findings referring to plaintiff's subjective comments. When asked to indicate the clinical signs or diagnostic findings which support her limitations, she wrote a significant amount but it is

31

illegible. Under the "comments" section, Dr. Houk noted that plaintiff's GAF has never been higher than 45, she has tried three different mood stabilizers so far and has not been able to stabilize him. The remainder of her comments are illegible.

On August 8, 2007, plaintiff saw Dr. Houk (Tr. at 262). She assessed personality disorder, insomnia, and some other unidentifiable condition. Plaintiff's GAF was 40.[11] She prescribed Depakote (anti-seizure medication) for general anxiety disorder.

On August 14, 2007, plaintiff saw Dr. Houk (Tr. at 261). She assessed personality disorder and some other unidentifiable condition. Plaintiff's GAF was 52.[12] The notes also indicate that plaintiff left a message on voicemail on September 11, 2007. Based on the message, the doctor thought plaintiff may have "gone manic" and possibly went to the emergency room. The notes also indicate that the doctor called plaintiff on September 12, 2007.

---

[11]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[12]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

32

She learned that for three days plaintiff could not think and was confused, then he was calm for one day, then he became depressed and was feeling overwhelmed. She called in a prescription for Risperdal, an anti-psychotic medication.

On September 26, 2007, plaintiff saw Dr. Houk (Tr. at 260). She assessed personality disorder and some other unidentifiable condition. She prescribed Depakote ER (anti-seizure medication), Skelaxin (muscle relaxer) and Lexapro (an SSRI used to treat depression and anxiety). Plaintiff received samples of the medications.

On October 8, 2007, plaintiff saw Dr. Houk (Tr. at 259). She assessed some unidentifiable condition. Plaintiff's GAF was 45.[13] She prescribed Depakote ER (anti-seizure medication), Skelaxin (muscle relaxer) and Lexapro (an SSRI used to treat depression and anxiety).

On October 24, 2007, plaintiff saw Dr. Houk (Tr. at 258). She assessed personality disorder and some other unidentifiable condition. Plaintiff's GAF was 50.[14] Dr. Houk prescribed

---

[13]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[14]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends,

Case 6:07-cv-03449-REL   Document 21   Filed 11/07/08   Page 33 of 47

Zonagran (anti-seizure medication), Depakote ER (anti-seizure medication), Skelaxin (muscle relaxer), Amantadine (fights viruses), and Lexapro (an SSRI used to treat depression and anxiety).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge David Fromme entered his opinion on February 23, 2007 (Tr. at 19-28).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 22).

Step two.  Plaintiff suffers from depression, personality disorder, and residuals from a wrist fracture, which are severe impairments (Tr. at 22).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 22).

Step four.  Plaintiff's subjective complaints are not entirely credible (Tr. at 26).  He retains the residual functional capacity to perform a wide range of medium exertional work with the ability to lift and/or carry up to 25 pounds frequently and 50 pounds occasionally; to stand and/or walk for up to six hours per day; to sit for up to six hours per day; and should avoid repetitive or frequent handling (Tr. at 22).  He has the basic mental capacity for most work activity with the ability

unable to keep a job).

34

to understand and remember simple and moderately complex instructions, to sustain concentration and persistence for simple and moderately complex tasks, to interact in moderately demanding social situations, and to adapt to his environment (Tr. at 22). With this residual functional capacity, plaintiff cannot return to his past relevant work as a bench grinder, building maintenance person, machine tester, bar attendant, or warehouse worker (Tr. at 26).

Step five. Plaintiff is capable of working as a counter clerk with 2,500 jobs in Missouri and 100,000 in the nation, or a furniture rental clerk with 700 jobs in Missouri and 35,000 in the nation (Tr. at 27).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. <u>Rautio v. Bowen</u>, 862 F.2d 176, 178 (8th Cir. 1988); <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. <u>Gray v. Apfel</u>, 192 F.3d 799, 803 (8th Cir. 1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ,

35

however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered:

Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

Claimant has a limited work history, with generally low and inconsistent earnings. The claimant has required very little medical treatment, with no medical treatment for over a year before he filed his application for disability. . . . This lack of treatment is considered a factor in discounting complaints. The claimant has not reported a need for any strong pain medication, and has not been prescribed strong pain medication for his alleged pain. On the disability report, appeal, the claimant reported taking no medications. The claimant has reported that he is able to do normal activities as he feels them necessary. . . .

Based on the record as a whole, and specifically the factors noted above, the undersigned finds that claimant's allegations of totally disabling, medically determined impairments not credible

. . . In considering the claimant's alleged mental problems, the undersigned notes that he did not seek any treatment for this until after he filed for disability, and has not sought treatment other than medication. Impairments which can be controlled by treatment or medication are not considered disabling. The undersigned notes that when the claimant was started on medication he reported a significant improvement. The undesigned has considered the State agency medical consultant opinion, but finds that the later records received do indicate more than a minimal limitation due to his mental problems. The undersigned finds that the claimant has no restriction of activities of daily living; moderate difficulties in maintaining social functioning;

mild difficulties in concentration, persistence or pace; and no episodes of decompensation of extended duration. The undersigned further finds that the claimant retains the basic mental capacity for work activity as indicated in the residual functional capacity found above. The claimant's allegations of more severe limitations are not found to be supported by the evidence of record.

(Tr. at 26).

Most of the ALJ's analysis deals with the credibility of plaintiff's physical symptoms of pain. The record is clear that plaintiff has not suffered from "disabling" pain. With respect to plaintiff's mental impairment, the ALJ discredited plaintiff based on two things: (1) the fact that he did not seek treatment, and (2) the fact that plaintiff "reported a significant improvement" in his mental condition after being prescribed medication.

Normally, lack of medical treatment is a strong factor against a finding of disability. Benskin v. Bowen, 830 F.2d 878 (8th Cir. 1987). However, this case is rather unique in that the impairment includes a fairly frequent inability of the claimant to seek out medical treatment or interact in any way with others. Plaintiff is not suffering from disabling pain. He suffers from a mental impairment which causes him to isolate himself from society; live in the woods; rarely see people; fear hospitals, food stamp offices, and other public places with figures of authority.

38

Plaintiff reported in his administrative records that he was
eligible for food stamps and got them briefly.  His explanation
as to why he stopped getting his food stamps makes no sense --
that he gained weight.  If that were the reason, plaintiff could
have purchased lower calorie food rather than ignoring the
assistance of food stamps.  Instead, he stayed in the woods by
himself.  Plaintiff let his driver's license expire, and his
explanation for not renewing it even though he wanted to was that
he did not feel comfortable with doing it.

Dr. McGehee noted that plaintiff lived in the woods and is
very alone and withdrawn.  The Personality Assessment Screener
revealed a "markedly disturbed person who is seriously paranoid.
He is extremely withdrawn and alienated from other people. . .
He seems to have little support system."  Dr. Lutz found that
plaintiff has often felt that others might take advantage of him
and try to hurt him, that he lives in a trailer alone, that he
wants to fit in with others and goes through "waves" of
attempting involvement with others, but that he "does not like
others looking at him".  A doctor at the Medical Walk in Clinic
described plaintiff as a recluse.  Three different doctors agree
that plaintiff is essentially unable to live a normal life
outside the confines of his trailer in the woods.

It makes little sense to find that because plaintiff has not
sought medical treatment he is perfectly fine when the main
reason for his not seeking medical treatment is his impairment.
The finding that a person who has not sought medical care is not
disabled is merely an inference to be drawn from the lack of
treatment.  In this case, I find that the inference that
plaintiff is not disabled cannot be drawn due to the other
factors, i.e., his mental impairment which prevents his seeking
regular medical treatment.

In addition to the above, it is undisputed that plaintiff
did not have the financial resources to seek regular medical
care.  He does not have medical insurance.  He did not have a
Medicaid card until after his alleged onset date.  Again, his
explanation for letting the Medicaid card expire made no sense
and is consistent with his failure to use his food stamps or
renew his driver's license -- his mental impairment isolates him
so that he is unable to carry on this type of everyday business.
While plaintiff had Medicaid, he received regular mental health
treatment; however, none of the medicine plaintiff tried helped
him much.  After his card expired, he had no way of paying for
medical or mental health treatment (Tr. at 136, 290).

Finally, the ALJ's finding that plaintiff reported a
"significant improvement" once he went on medication is a mystery

40

to me.  I have found nothing in the record to support such a finding.  Plaintiff was seen at the Medical Walk in Clinic and was diagnosed with Bipolar Disorder on his first visit.  He was prescribed an anti-psychotic and an anti-depressant.  Later that month he continued to experience frequent chest pains, numbness in his right arm, depression, and increased worry.  A little over a month later, plaintiff reported difficulty sleeping, feelings of guilt and worthlessness, and a loss of interest in things.  His anti-depressant was changed and the doctor added an anti-anxiety medication.  A month later, plaintiff reported feeling hopeless and dreadful, and an inability to sleep.  Plaintiff's Prozac and Xanax doses were adjusted.  The doctor noted that plaintiff's anti-psychotic medicine was causing irritability and bad dreams and he considered changing that to two different medications if plaintiff's symptoms did not improve.  By the following month, plaintiff cried through his exam.  He reported anxiety and an increase in mood swings.  He had not slept for four days, was feeling scared and frustrated.  The doctor prescribed a different anti-psychotic medication and found that plaintiff's Bipolar Disorder was not controlled.

I fail to see how this medical evidence would suggest that plaintiff experienced "significant improvement" on medication.

41

Using the Polaski factors, I observe that (1) plaintiff's work history shows very sporadic and low earnings and an inability to stay at any one job for any length of time; (2) plaintiff's daily activities consist mainly of living in isolation, sometimes without utilities or food despite assistance at least with food being available through government programs; lying in bed all day when depressed; treating physical symptoms with Slushys; (3) plaintiff's symptoms have been present for years; (4) plaintiff's symptoms are so severe that he is often unable to function outside the isolation of his trailer in the woods; and (5) plaintiff's medications have not provided him with much if any relief and have caused serious side effects such as bad dreams, irritability, and an inability to sleep for days.

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff's subjective complaints are not credible. Because the vocational expert testified that a person with the limitations as described by plaintiff would not be able to work, plaintiff's motion for summary judgment on this basis will be granted.

## VII. OPINION OF PLAINTIFF'S TREATING PHYSICIAN

Plaintiff argues that the ALJ erred in failing to adopt the opinion of Dr. Houk that plaintiff is disabled. The argument

42

among the parties here is whether Dr. Houk's opinion can be considered since it was rendered sometime after the ALJ's decision and therefore does not pertain to the relevant time period. Because I have found that plaintiff is entitled to summary judgment on another basis, I will not address this argument in depth. However, I do note that the substantial evidence in the record supports Dr. Houk's opinion which is supported by the findings of Dr. McGehee and the treatment records of the doctor at the Walk in Clinic, both of which were produced during the relevant time period.[15]

Dr. McGehee observed that plaintiff was unkempt, dirty, unshaven, was wearing unclean clothing, exhibited poor personal hygiene, had dull facial expressions, had poor eye contact, exhibited bizarre mannerisms, appeared severely anxious and depressed, was fairly suspicious, was tearful, and exhibited a thought disorder and obsessions. Dr. McGehee administered multiple psychological tests which supported diagnoses of Bipolar I Disorder, severe, and schizoid personality disorder.

Dr. Lutz noted that plaintiff cried through the exam, his hygiene was less than adequate, his clothes were tattered, he looked disheveled, and he exhibited dysphoria. The tests that

---

[15]Neither Dr. McGehee nor the doctor at the Walk in Clinic rendered an opinion as to plaintiff's specific mental limitations as Dr. Houk did.

43

Dr. Lutz administered are to test memory and brain function after a head injury.  For example, serial sevens, counting down from one hundred by sevens, is a clinical test used to test mental function to help assess mental status after possible head injury or in suspected cases of dementia.  It forms part of the mini mental state examination.  On its own, the inability to perform "serial sevens" is not diagnostic of any particular disorder or impairment, but is generally used as a quick and easy test of concentration and memory in any number of situations where clinicians suspect that these cognitive functions might be affected.  Similar tests include serial threes where the counting downwards is done by threes, reciting the months of the year in reverse order, or spelling "world" backwards.  The other tests administered by Dr. Lutz enabled him to make a diagnosis with respect to plaintiff's memory and intellectual functioning, neither of which are really the cause of his disability.  Curiously, Dr. Lutz found that because plaintiff has only received limited treatment, he must be OK.

Dr. Aram, who did not examine plaintiff but rendered a brief opinion on his credibility after reviewing the medical records, concluded that plaintiff was not credible because he had an "adequate work history", which I note to be an odd finding[16] in

[16]During one nine-year period, plaintiff earned a total of $25,385.84, giving him annual average earnings of $2,820.65 (or

44

this case, and because of his lack of treatment.

Plaintiff's treating physician at the Walk in Clinic in Springfield observed plaintiff as being sad, crying, isolated, anxious, depressed, disheveled, and tearful -- all observations consistent with everyone else who had observed plaintiff. Plaintiff was diagnosed with bipolar disorder, depression, panic attacks, insomnia, obsessive compulsive disorder, and possibly schizophrenia.

Plaintiff's global assessment of functioning prior to the administrative hearing was anywhere from 31 to 55 (major to moderate impairment in several areas, such as work or school, family relations, judgment, thinking, or mood).

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's mental residual functional capacity assessment and that the substantial evidence supports a finding that plaintiff is disabled.

## VII. CONCLUSIONS

I reiterate here that I consider this case very unique in that the lack of medical treatment is not a strong factor against a finding of disability.  As mentioned above, the well-accepted

---

$54.24 per week).  During that nine-year period, plaintiff worked for 20 different employers.

Case 6:07-cv-03449-REL   Document 21   Filed 11/07/08   Page 45 of 47

rule is that lack of medical treatment nearly always results in the inference that the claimant is not disabled. In fact, in my almost 20 years on the bench, I have never seen a case that did not deserve that inference. However, in this case, the plaintiff's impairment does not include severe pain. His disabling impairment is entirely mental. But the unusual factor here is that his mental impairment actually causes him to isolate himself, a symptom that is inconsistent with frequent medical care. It is clear that this plaintiff is not seeking benefits in lieu of working -- he was given food stamps and he stopped using them; he was given a Medicaid card and he stopped using it; he was offered a lawyer at his administrative hearing and he declined. In fact, I have some concerns that plaintiff may not utilize the disability benefits that he is being awarded by this order, considering his history of rejecting assistance and isolating himself.

I point all of this out because I do not intend this order to be interpreted as "new law." The well-established law is that lack of medical treatment is a <u>strong factor</u> against a finding of disability, it does not result in an ipso facto finding of not disabled. The specific facts of this case rebut the presumption normally created by the lack of medical treatment.

46

Based on all of the above, I find that the ALJ's conclusion that plaintiff is not disabled is not supported by substantial evidence in the record as a whole. I further find that the substantial evidence in the record supports a finding that plaintiff is disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.

*/s/ Robert E. Larsen*

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 7, 2008

Case 6:07-cv-03449-REL   Document 21   Filed 11/07/08   Page 47 of 47